Judge Newsome, Judge Branch and I are happy to welcome you to this courtroom for this argument in a capital case. You know our lighting system. When the yellow light goes on, that means that your time is drawing to a close, so you can begin to wrap up. If we take you on the red light, then don't worry about it. You're on our time and not yours. And with that, we will start. This is case number 20-12587, Ashley Lyndol Jones v. the Warden of the Georgia Diagnostic Prison. Ms. Witter. Thank you, Your Honor. Good morning and may it please the Court. This was a close case at sentencing and jurors struggled with their verdict, deliberating for just shy of seven hours before voting to sentence Mr. Jones to death. Given these facts, even a minor error at the trial could have made the difference between life and death. And in this case, we have troubling indications that things went awry with the jury. But despite diligent efforts, we have been unable to get to the bottom of what happened in the jury room at sentencing. What we know is enough to merit discovery and a hearing in federal court. As an initial matter, we know from the trial record that two jurors were excused for unexplained health reasons after the jury had found Mr. Jones guilty, but before they had imposed the death sentence. Indeed, one juror was excused in the middle of sentencing phase deliberations. That's unusual and even suspicious, but there's more. Based on limited information obtained from truncated interviews with one of the excused jurors, we know that some jurors were drinking alcohol with the bailiff during the trial and that one or more jurors may have consulted a Bible in the middle of sentencing deliberations. Can I ask you a quick question about that? So, boy, I feel like I'm loud. Am I loud? A little bit. Sorry about that. A little bit. Yeah. So, you said that we have indications that a juror might have consulted a Bible during sentencing. How would we know that? Because the juror who said something about the Bible was excused prior to sentencing, correct? Correct. And that's why I used the word may and not that we know that it did happen. What we'd like is the opportunity to find out whether, in fact, a Bible was in the jury room and whether it was consulted by jurors during sentencing deliberations. So what that juror recounted, right, was that there was a woman on the jury, so a female juror, who had a Bible with her. Correct, Your Honor. Right. We have no other specifics given, as you said, the truncated nature of the interview with that juror. Correct, Your Honor. Okay. And then the second one, the second incident that was related by that same juror was that she, he or she had seen jurors with the bailiff drinking alcoholic beverages while sequestered. Correct, Your Honor. And there's no other specificity in that statement about how many times or during what length of time or anything like that either? No, Your Honor. And that's what you want a discovery to explore? Correct. Okay. So the district court denied discovery with, basically, I think this is the guts of the ruling, that those allegations are not sufficient to show reason to believe that petitioner, Mr. Jones, may, if the facts are fully developed, be able to demonstrate that he is entitled to relief. And that's a quote from the district court's order at page 20. So, I guess one of the things that struck me is figuring out what the background legal landscape is, right? Because the Supreme Court has said in interpreting the good cause language of Rule 6a, that you may be entitled to discovery within the district court's discretion if you can prove facts that would entitle you to relief. And so one of the things we've got to look at are the background legal norms for figuring out whether or not any of these incidents could have provided a legal basis for Mr. Jones to get any sort of relief. So I looked, and I didn't find many cases, surprisingly, I would have thought that over the course of the United States history there would have been more of these, I didn't find many cases involving jurors or juries having Bibles during deliberations. We have one case, McNair from 2005, which says that on the facts presented there the state had sufficiently rebutted the presumption of prejudice from the introduction of a Bible. So what's your best authority for telling us that having something like the Bible would have in the jury room at some point would have given Mr. Jones a basis for some sort of relief? Well, Mr. McNair's case, in fact, is helpful because in that case he got process in state court, a process that we were denied. There was a full hearing, affidavits or testimony, live testimony from the jurors was presented, and the state court determined on the basis of the evidence presented about what in fact happened in the jury room that the passages from the Bible that were read were innocuous and didn't do anything to impact the guilt verdict. Right, on the merits issue, I think that's right, but this is, this claim does not involve edba deference in any way, right? It's just a question of whether or not the district court abused its discretion in not giving you the discovery that you requested. Oh, all I'm saying is that Mr. McNair got to have discovery and a hearing on the subject in state court, which didn't happen here. We have a relatively blank record because we've never been allowed to develop the evidence. But your claim about the Bible is that one juror reported that she saw a juror with a Bible. We know no other details about it. There's no, the juror, the juror who's reporting this to you is not saying that this, the Bible was in the jury room, that it was being used, that it was being shared with any jurors. None of that is part of the allegation that you've brought. It's simply that a juror was seen with a Bible. Correct. It could have been completely outside of any deliberations. They could have just been walking, they were sequestered. They could have been walking down a hotel corridor for all we know. Correct? Correct, Your Honor. So, so even if this is true that a juror had a Bible, how does that in and of itself rise to the level, like even if we assume it's true, the juror actually did have a Bible, why does that entitle you to relief? Well, I'm saying it entitles us to discovery and potentially a hearing, not to relief on the merits at this point. To finish my answer to you, Judge Jordan, one case that has granted relief on the basis of jurors having a Bible in the courtroom was the district court decision, Jones v. Kemp. The state never appealed it, so it never got to your court. Mr. Jones instead got a resentencing hearing based on the grant of relief in federal, in district court. Can I follow up on Judge Branch's question? Because it just seems, you know, there are 98 innocent explanations out of 100 for this juror just having a Bible. I don't know. I don't sort of carry a Bible around with me, but I don't think it would be odd for just sort of an average, ordinary American to carry around a Bible. And I guess that the concern is not necessarily that your contention is that that entitles you to relief, but that there's got to be some gatekeeping mechanism that a district court can, within its discretion, you know, sort of monitor to allow, and I don't mean to cast aspersions, but sort of fishing expeditions. It can't be that any old allegation of something that sort of 12 steps down the road might lead to, you know, sort of discoverable information is subject to an evidentiary hearing. Correct, Your Honor, and we're not asking for a fishing expedition. So first off, I would like to say that in many Supreme Court cases that have concluded that either discovery or a hearing should be granted, the allegations were just as speculative or even more speculative. In Wellens v. whatever the warden's name was at the time, Hall, there was no allegation of anything happening at the time of the trial. What happened was after the trial, jurors gave rather salacious chocolate gifts to the bailiff and the judge. They were so out of the ordinary and disturbing that ultimately the Supreme Court concluded that Mr. Wellens was entitled to a hearing on the subject to find out whether in fact misconduct had happened with the jury in advance of the presentation of those gifts. But Wellen had a cone error, and you're not suggesting we have a cone error here. But it's very clear, Your Honor, that Wellens was remanded because, first, the Supreme Court went into great detail about the facts in Wellens, which they didn't need to do if they were just doing a cone remand. They could have just said we remanded in light of cone. They didn't do that. And this Court, having considered the Supreme Court decision and remanded when the case returned, said, and I quote, the Supreme Court vacated our prior opinion and remanded this case back to us, suggesting that, quote, the disturbing facts of this case raise serious questions concerning the conduct of the trial. And that's why this Court remanded to the district court for a hearing. In Mr. Wellens' case, that hearing ended up showing that there wasn't misconduct, and Mr. Wellens lost that case. But, and that could happen here, but we don't know. And certainly, even if the Bible carrying isn't sufficient to merit a hearing, having drinks with the bailiff, which is in violation of the bailiff's oath not to have any socializing with the jurors, and potentially in violation of the jurors' oaths to base their decisions solely on the basis of the evidence presented in court and the law given to them by the judge, that raises serious questions that need to be answered. Was there an allegation as part of this juror's statement that any conversation at all attended the drinks with the bailiff? I mean, like, as part of the, I just don't recall, as part of the statement, did she say, oh, I saw, and, you know, sort of, and they were chatting, and they were talking or whatever? Because, you know, I mean, it seems to me that would be, at the very least, a necessary prerequisite to any discovery about extrinsic information. I think it's a very rare event for people to hang out together drinking alcoholic beverages and to be completely silent. So hanging out with the jurors, drinking alcohol was against the bailiff's oath. I'm happy to read the oath to you. It did not include being allowed to drink with the bailiff. Yes, but this was when they were sequestered in a hotel. So there are any number of innocent explanations that arise from that circumstance, such as if they're in a hotel, the bailiffs are staying in a hotel, bailiff goes down to the hotel bar, someone sees a juror walk up and order a drink next, standing next to the bailiff. I would agree that outside of a situation where they're sequestered, that might seem more unusual, but they are sequestered, they're both staying at the same place at night. If we have a bailiff who just went down for a drink and a juror happened to go down for a drink, they sort of, ships passing in the night, there are innocent explanations, correct? But the question isn't whether there are innocent explanations, it's whether, if the facts are engaged in a misconduct, whether, so Mr. Jones presented a broad allegation. Your position is, as I take it from your brief, is that although there might be innocent explanations for that conduct, there could also be more sinister explanations for that conduct. In other words, it could have been a normal occurrence for this bailiff and these jurors during sequestration, and as you indicate, people don't usually drink without talking, or at least talking some, and heaven knows what was discussed between them. Correct, Your Honor, and the bailiffs took a note that said, you shall make no communications with the jurors yourselves, nor permit anyone else to. It's very hard to believe that drinking, like, what the juror reported was that she saw the bailiff, I see that you got a drink and walked away. So I think that there's the potential for really damaging circumstances to have happened during this trial that need to be explored. And the Supreme Court cases indicate that we are entitled to some sort of process in this case. In Bracey, the defendant had no evidence of any misconduct in this case, so what he had was proof that the judge, in other cases, had taken bribes, and the supposition that because he was taking bribes in some cases, he may have been inclined to act differently with cases that weren't being paid. He didn't have any idea whether that happened in his case, and in fact, his allegations were so, were more speculative than ones that we've made here, and some of his factual allegations were made in the Supreme Court at argument. Can I ask you just a quick question about the nature, so the standard here, of course, is something you've got to contend with, abuse of discretion. Exactly what is the nature of the abuse that you allege here? Do you allege that there's an error of law that is per se an abuse of discretion, or that this is just like a clear error in judgment? It's both, Your Honor, and it's also an error of fact. First the judge said that the only basis I have for believing any of this is that there's an unsworn statement from counsel saying that this, in fact, happened. An unsworn statement from counsel, I humbly submit, is almost as good as a sworn statement, and in fact, the record was then supplemented with sworn statements of counsel to that effect, and the judge, in his evidentiary hearing ruling, didn't even notice. That's an error of fact. The judge also required a degree of proof that's not required in the case law, even in Bracey, where there really wasn't any proof at all. The court said where specific allegations show that there's a reason to believe that if proven, the petitioner may be entitled to relief. It is the duty of the court to provide some process. That's not even the normal abuse of discretion. Bracey clearly indicates that courts have an obligation to permit petitioners in habeas cases to develop the facts of their cases when it's, you know, when he's done more than ask for a fishing expedition, and here we have enough proof to show that we're not asking for a fishing expedition. We have clear allegations about something that happened, and we would like to find out whether those actions of the jurors ultimately damaged Mr. Jones or not. In Wallens, the court explained that the question before the court was, quote, whether Jones's he had learned entitled him to the discovery and evidentiary hearing he sought, not whether he was entitled to ultimate relief on the merits. Can I get you to switch over to the ineffectiveness claim so that we discuss it a bit? Sure. I mean, if you have a little more to go on the discovery issue, I don't want to cut you off, but I want to make sure we get to the second issue as well. Certainly, Your Honor. I do want to say that we're not asking for a whole lot. It might be that we're asking for an opportunity to investigate what happened in the jury, and if it pans out that, in fact, there was misconduct, you'll see us again arguing that claim. But if it turns out that nothing really happened with the jurors, then that claim will go away. We just haven't had the opportunity. And as the court, district court found, we were very diligent. We did everything we were supposed to do in state court, and there's no impediment in this case to factual development. There's no 2254D barrier because the issue wasn't addressed on the merits. There's no procedural default because the state habeas court didn't even address this claim, and as the district court twice found, we were diligent. But if the court has no questions about this issue, I'm happy to move on to the misconduct and the ineffectiveness associated with it. And so here's how I'm thinking about this second issue. Let's assume, for purposes of our discussion, that Mr. Jones' counsel was ineffective for not objecting to the statements that are at issue, the so-called attack on Mr. Jones for exercising his constitutional rights and the misstatement of his age. As you point out, one of the big issues at trial, and I know that you say that the defense lawyer did a horrible job of trying to help Mr. Jones on this, but one of the big issues at trial was who the actual murderer was, right, and who was there just for the other crimes or helping out but didn't strike the lethal blows. Mr. Jones testified, so how do we factor his testimony and the jury's, I would say, apparent or implicit disbelief of at least a portion of his testimony about culpability in figuring out Strickland prejudice? Well, the jury struggled at both phases of the trial to answer the questions that were put before them. In the guilt phase, they had questions about whether they wanted to know what happened to the co-defendant, Mr. Bunner, who had been given a life sentence a few months before in a separate trial unanimously by the jury. They didn't learn that. Mr. Thigpen didn't make an effort to put that information in front of the jury, but nonetheless, the jury wanted to know what had happened to Mr. Bunner, and they wanted to know whether Mr. Jones was left-handed or right-handed, and whether Mr. Bunner was left-handed or right-handed. That question, I think, was never addressed. I don't think it was addressed at trial. It was addressed in the sentencing phase, perhaps, but not at the guilt phase when the jury was curious about it. So the jury was pretty on the fence at some point in deliberations of the guilt phase, and then when you move into deliberations in the penalty phase, those lasted close to Georgia cases, and the jury was divided nine to three for an extended period of time. The jury deliberations began, I believe, on a Monday or Tuesday in the afternoon. The jurors deliberated for three and a half hours, I believe, before dinnertime and then asking to be relieved for the rest of the day, and at that point in time, they were nine to three in whatever direction they were. So over the course of that night, another juror was excused early that morning, another juror was excused, Ms. Douglas, and the second alternate took her place, and jury deliberations began again, and a few hours later when the jury came in before lunch, the foreman said once again they were divided nine to three. This jury really struggled, and that's an important thing to consider irrespective of whether the jury believed Mr. Jones' testimony or not. There was basically undisputed evidence of his guilt in a felony murder, right? This is true, Your Honor. Right, so the issue really wasn't going to be guilt or innocence. Even before he testified, the government had presented a fair amount of evidence which, if believed, showed that he was there and he engaged in the offenses that led to the So I guess I'm struggling to figure out how you think that those prosecutorial comments were prejudicial in light of the entire record. Well, Your Honor, in light of the entire record, first the prejudicial arguments that this court has selected to address. So, for example, let me just tell you the misstatement of his age. There were, the district court noted here that there were numerous mentions of his correct age at the time of the offense during the trial. There were not, Your Honor. The district court was mistaken in that. There were, nobody testified at all about his age. Nobody said that Mr. Jones was 19 at the time of the crime. There was testimony from the victim's son, Donald, that he at the time was 17 and he thought that Mr. Jones was a couple years older. And there was statements from the district attorney noting that Mr. Jones was 22 at the time of the trial, which he could only have known by knowing when Mr. Jones was born because he had only just turned 22. And given that, he obviously must have known that Mr. Jones was 19 at the time of the trial. You can't forget that the state had lost a case by not getting a death sentence with Mr. Brunner's trial, and he was quite committed to getting a death sentence in this case, and his closing arguments reflect that. The prosecutor called Mr. Jones 21, not once but twice, and this was in the context of an argument in which he centered around distinguishing the purportedly good child Mr. Jones had been, which is what the jury heard in mitigation, with the evil, with the good child of God Mr. Jones had been in his youth from the man he had turned into who had turned away from God and as his inherent evil had begun to blossom. Can I ask you a quick question? Do you contend, I guess sort of secondarily, that it was ineffective assistance for the focus of the mitigation case? It was definitely ineffective of Mr. Jones' lawyer, Mr. Thigpen, not to make age at least some, I mean, he could have easily corrected the statement in his closing argument. Well, the reason I ask is that unlike in a case like Johnson, which you cite for support, in which age was a focus of the mitigation case, here, rightly or wrongly, age seems not to have been a focus of the mitigation case, and if we grant that that was a reasonable strategic judgment, wouldn't it likewise also be a reasonable strategic judgment not to object to a couple of sort of rogue references to the wrong age? So as not, for instance, to draw attention to the fact that this was not a 15-year-old kid but someone, you know, sort of over the age of majority in some respects, not a child, a young adult, it just seems like, you know, as to performance, if you're not going to sort of ride the age horse, then maybe you don't want to draw into attention to it. Mr. Thigpen wasn't really riding any horse at trial. He had Mr. Jones' mother assemble witnesses the weekend before the sentencing case began. Well, this sounds like it might be a different ineffective assistance claim, but it's not the ineffective assistance claim that we're here debating, and sort of once, if we're only here talking about the ineffectiveness of a failure to object, and you have to demonstrate that no competent lawyer could have made that judgment, then given the other assumptions that we have to make about the reasonableness of the trial counsel's conduct, I just think it's tough. Well, Your Honor, we have to view trial counsel's conduct at this instance in the context of the entire trial, which includes all of other counsel's other failures to do his job, and we urge the Court to expand the COA, which the Court can do. I think it did so in the Clark case out of Alabama, I believe, but I can supplement the record with a citation, but you can't say we're not going to look at counsel's inadequacies and then presume that he was doing okay with all the other choices that he made and then use that to justify why he wasn't ineffective in this instance. Youth is more than a chronological age, as the Supreme Court has told us. It is the time and condition of life when a person may be most susceptible to influence and to psychological damage. Our history is replete with laws and judicial recognition that minors are generally less mature and responsible than adults, and that doesn't cut off at the age of 18, as the Court recognized in Roper. It was important for the jury to know this. The trial judge in his report following the trial recognized that Mr. Jones's age was and what was the downside of pointing out that Mr. Jones was an impetuous teenager at the time of this crime? Ms. Whitter, you've gone over your time, but I'll let you wrap up and then have you reserve all of your time for your rebuttal. Thank you, Your Honor. Mr. Jones's representation, Mr. Thigpen represented that he would object as soon as improper remarks left the prosecutor's mouth, and he failed to do that with one exception, and that was the exception when Mr. Curry said that he was appointed counsel rather than retained, a little rotten piece of plankton floating in a sea of misconduct. We respectfully submit that the misconduct that this Court has allowed us to address is sufficient to warrant relief, given the facts of this case and the closeness of sentencing deliberations. With that, I will sit down. All right. Thank you very much. And before Mr. Malcolm starts, Ms. Whitter, I know that you were appointed to represent Mr. Jones in this case, and on his behalf and our behalf, I want to thank you for taking on that appointment. We couldn't do our jobs without lawyers like you taking on that sort of responsibility, so thank you. Thank you, Your Honor. I reserved five minutes for rebuttal, so I'm hoping that I get that. Yes, I hope I made that clear. I didn't want to forget thanking you for taking the case, but yes, you've saved all of your time for rebuttal. Thank you, Your Honor. Mr. Malcolm. Good morning, Your Honor. May it please the Court. My name is Clint Malcolm. I represent the warden in this case. We respectfully ask this Court to affirm the district court's denial of a petitioner's request for discovery in an evidentiary hearing on the two juror misconduct claims, and we of relief on the ineffective assistance of counsel claims. Excuse me. And since we were just discussing those, I'll start there with the ineffectiveness claims. I think we can get straight to the point of petitioner's failure to really argue or cite controlling precedent that makes a viable prejudice strickland argument under the facts of this case in regards to these two claims of ineffectiveness for not objecting during the prosecutor's closing during summation, or closing following the sentencing phase. Do you think the statement was appropriate? The statements were appropriate? Well, first in regards to the age, Your Honor. Of course, the record shows he was, I believe, 19 years old and 10 months approximately at the time of the crime, so those two statements by the prosecutor were not accurate. We don't know anything more beyond, they seem from the entire context of his argument to be sort of fleeting statements. He makes the statement twice that he was 21 years old, but we do know from the record, and the district court pointed this out in its order, that petitioner testified in both phases of the trial that he was 22 years of age as he sat there during the trial. The jurors certainly had other information, as opposing counsel has noted, about petitioner's age at the time of the offenses of murder. So the jury had evidence of the petitioner's actual age at the time of the crimes. The jury was also charged by the trial court that counsel's arguments were not evidence and that the evidence presented from the witness stand was evidence. That was a jury charge that was given following the guilt phase. So if we want to go straight to the prejudice prong of Strickland in regards to the age of the petitioner and the prosecutor's two statements in closing about that, I think the easiest way to deal with it is the jury knew how old Mr. Jones was based on the evidence that was presented. We do not know why counsel did not object to those two misstatements of petitioner's age. He was never questioned about it at any proceeding in state court. So we simply don't know if it was strategy on his part. We can presume, obviously, under Strickland that he had a reasonable basis not to object. It certainly would be reasonable, I believe, not to draw further attention to an issue. Petitioner was indisputably an adult at the time he committed this heinous crime. So he was two months away from his 20th birthday. There was obviously no youthful component of trial counsel's mitigation presentation. So I think you can argue certainly that counsel would have had a reasonable basis under strategy to simply not object to those two comments. At the co-defendant's trial, to the extent you know, did the state argue that the co-defendant was the murderer? I don't know that, Your Honor. As I sit here today, I know that was not the argument in Mr. Jones's trial. I think the evidence . . . The state argued in Mr. Jones's trial that he was the killer, right? Correct. Okay. So my question is, in the co-defendant's trial, did the state make the same argument about the co-defendant? I don't know, Your Honor. I apologize for not knowing that. I know that the state's . . . Something a little important to know, right? Not for you that you don't know it, but something important to know in terms of background, right? Sure. Gut state argues with defendant number one. You're the killer. You're the one who lifted the wrench or the sledgehammer and, you know, brutally killed the victim. Jury apparently disagrees. Guilty verdict, but life sentence. And now you switch gears and you're like, oh no, you, defendant number two, you're the killer. Sure. You're the one who lifted the sledgehammer and killed the victim. Right. Well, and I know that the evidence that was presented in Mr. Jones's case, the victim's wife who witnessed the murder identified Mr. Jones as the primary assailant who hit her husband with a sledgehammer, I believe, multiple times, six times. Mr. Jones even testified himself at his trial and admitted to being there and to hitting the victim at least two times with a ratchet. So as you alluded to earlier, there's certainly no dispute that he was at least guilty of felony murder under his own testimony. So I struggle to see how they, how petitioner can make a prejudice, a viable prejudice argument based on the facts that were presented in the guilt-innocence phase, coupled with the overwhelming, aggravating nature of the evidence that was presented in the sentencing phase. So that is my primary argument in regards to both of the ineffective assistance of counsel claims. I do want to make note that those two specific ineffectiveness claims that we're here on today were not raised until the first time I can see that they're actually raised is in the district court when petitioner raised his merits brief, which was in 2017. There were some vague general claims of ineffective assistance of counsel for not objecting to the prosecutor's closing that were raised in state habeas, but these specific claims were never raised. They were never addressed below. Did the state court ever address those general ineffectiveness claims? It did not. So, I mean, we've got sort of a messy record. I would agree with that. Because the state court could have potentially said whatever claims you've raised about failure to object, they fail on the merits or they fail for other reasons, procedural or otherwise, but it didn't rule at all. Sure. And so we're left with that state of a record. I agree. It is an unusual procedural posture to say the least. I will just note that there's nothing whatsoever in the state habeas record in any of their pleadings or argument about these two specific ineffective assistance counsel claims that counsel didn't object when the prosecutor said he was 21 years of age twice and didn't object when the prosecutor talked about the defendant's rights. So I don't think that's even in dispute at this point. So I acknowledge, Judge Jordan, your concern about the state habeas court not addressing any of those generalized claims in its final order, but I did want to put that on the record to make sure that the court was aware of that. So I do believe that that could present a procedural default issue in that those specific factual claims of ineffective assistance. What is this? I've read the district court order several times, but I now forget what, if anything, the district court said about that issue of exhaustion or default. The district court said that we had waived our procedural default argument because of language we asserted in our return and answer to the district court. However, these specific claims weren't raised in the petition as it was originally filed. So when we responded in our return and answer, these specific claims had not even been raised. So these claims weren't raised until the substantive briefing stage of federal habeas in the district court. With regards to, so we can finish up this aspect of the claim, with regards to the prosecutors, I use the word link. It may not be the right word, but linkage of Mr. Jones's exercise of his constitutional rights and his failure to record the victim any rights. Was that statement or that comment an appropriate one for the prosecutor to make? Your Honor, I'm not sure it was an argument that I would make. It is not necessarily, that isn't the standard, obviously, to look at. I think whether counsel was reasonable to not have objected to those comments. And obviously, to make that determination, you need to discuss whether it was improper. I know that's not the question, but it's a background question. Sure, I think it goes up to the line. I don't believe it crosses it. When you look at the case law cited by Petitioner in support of their argument, that it was an improper argument. I think if you look at the entire context of the prosecutor's closing argument and sentencing, it is a theme of choices. He talks about choices the defendant made and he talks about choices the victim made to come out and try to help somebody he thought was in need of assistance early one morning. And he does talk about the defendant's rights. He says the defendant has the right to a trial and the right to counsel and the right to have people come in and plead his defense and ask for mercy. However, there's no negative inference that I believe that was argued or that can be drawn from his summation when you look at it in its complete context. The two closest cases that Petitioner cites are the state court cases out of Alabama and Mississippi, and I apologize, I don't have the names off the top of my head, where those were more of a closing argument where the prosecutor made sort of a comparison between defendant's rights and the victim's rights. I would say the facts in both of those cases were more egregious. The prosecutor went a lot further. But I also would point out that those cases not only were not binding precedent in Georgia, but they weren't even in existence in 1995 when this case was tried. So we got to look at what counsel was thinking at the time when the prosecutor was making this argument and whether his decision not to object was reasonable. And I believe based on the record we have, we can say that counsel was not deficient for not making these objections and certainly that Petitioner has not shown prejudice under Strickland in regards to either of these two claims. Okay. If there are no further questions on the ineffectiveness claims, I'm happy to move on to the discovery and evidentiary hearing claims on the juror misconduct. I'll just start by saying the district court, we agree with the district court's conclusion. There simply wasn't enough specific factual allegations to warrant discovery or a federal evidentiary hearing in regards to either claim. Let me test the district court's belief that there wasn't enough here. And so let me test it with a hypothetical that is not this case. Okay. Okay. The statement from the juror who was interviewed was that during the period of sequestration, the same two jurors had drinks with the bailiff four times on four different nights. Okay. Do you get discovery? No. Seven. Let's extend the trial period that's not this period. Seven straight nights. Answer would still be no. And the reason for that, if I may... Two weeks. I don't think any amount of time... I'm going to keep extending you. Sure. My answer wouldn't change and here's why. So for a 30-day trial, a one-month trial, same two jurors are having drinks with the bailiff every night during sequestration and you would say that you don't get discovery to find out what in the world transpired during those 30 days. Well, I need to have more, right? I need to have... That's all there is. Well, then that's not enough, in my opinion. Okay. You and I disagree about that hypothetical. Okay. I understand that. And if I could explain... Because it seems to me... Sure. And then, of course, I'll let you explain. But I want to let you know where I'm coming from. And this is only for myself, not for my colleagues. Context matters. And so what might have happened on one given night, as Judge Branch explained, a possible innocent explanation, jurors are sequestered, somebody comes down to the bar or the restaurant, people are drinking, somebody stops by and sits, says hello, whatever. But when you're doing that with the same two people and you are violating your oath, both sides are violating their oath for an extended period of time and doing this on a nightly basis, it seems to me that the context greatly changes. I understand that that is a vastly different hypothetical than the facts in this case. But I wanted to sort of have your idea of where you thought the line was. But you think that there's no line. Well, no. No, I definitely think there's a line. Well, two months? Well... Or are you going to give me the same answer? All you're giving me is a time element. Two specific jurors with a specific bailiff for... Every night during sequestration. Okay. Every night they have drinks at the bar. And it's only those two. It's nobody else. The other jurors are completely excluded. And you've got those two jurors, let's use 30 days. 60 days, 90 days, 120 days. Right. I sat over four and five-month trials as a district judge. So they're unusual, but they do happen. Sure. But your point is, and it may be right, that if that's all I'm giving you, the time doesn't change the answer. And you could go on infinitum and you still wouldn't get discovery on that claim. Well, I would think, and obviously as you pointed out, that's not what was pled here. But there still, in my opinion, would need to be more. Because the law says they have to offer enough specific factual allegations that if those could be proven true, that they would be entitled to relief.  If the facts are fully developed. Fully developed. You don't... In normal cases, people don't seek discovery because they already know what they have. Sure. Right? You may have the bare bones, but you want to flesh them out and figure out exactly what they are. So, for example, question number one in that 30-day hypothetical, if you got discovery, would be, what did you discuss? Oh, we realized that we have a common interest in fishing. And we kept talking about that all the time. And if that's all that's proven, then there's no relief. Right. But if they're talking about, wow, did you see the testimony today? What did you think about testimony today? Well, I really wouldn't have believed that witness because of this. I've been around for a long time. Sure. So, you don't have... If you want discovery, you don't have the claim. If you had the claim, you wouldn't need discovery. So, there's got to be some slight difference between what you need to show to get discovery and what you need to prove to win on a claim. Right? And that's what I'm trying to figure out in my head. I understand. And it is difficult. Because you, looking at the standard, it's sometimes easier to put the cart before the horse and say, okay, well, right, they don't have to prove that they are entitled, that they would be, get a reversal, right? Or they get a grant of habeas relief. But in order to bring jurors in, so what they're asking for is for the district court to allow them to take the deposition of every pettit juror that sat in this capital trial and to bring every single one of them in to testify live and in person at a federal hearing. Obviously, the no impeachment rule is in existence for a reason. There are exceptions to it. The two primary ones being any sort of external influence brought to bear on the jury during deliberations or any sort of extra judicial information. Certainly, Judge Jordan, your hypothetical raises concerns, right? If that was a scenario that was specifically pled, that would be more concerning than what we have here. And there has to be a balancing, right? There has to be a balancing. But I think the primary difference in this case is the conclusory, simple allegation, the only one that was made in regards to the bailiffs. This female juror who was removed or who was excused after the guilt phase said she saw some jurors drinking alcohol with a bailiff during, while they were sequestered. And that's all we know. Isn't the piece of it that's missing what was just in Judge Jordan's last question? There, the juror who gave this testimony didn't say and they were having a conversation. Correct. Or they were meeting this many times and I overheard them saying something about evidence or the trial or something relevant to the case. The juror had said, I saw them in the bar sitting next to each other and they were talking. Is that enough? That would get them closer, obviously, but I'm still not sure that that would be enough because there has to be, I mean, they argue that they were precluded from developing any sort of record in state habeas. And while the state habeas court did grant the protective order and did prevent them from bringing jurors in to testify, there was nothing the state habeas court did that prevented them from speaking to jurors or from trying to obtain affidavits or from speaking to the bailiffs, right? That's theoretically true, but practically false. Well. The jurors, the DA sent a letter telling them, essentially, don't talk to them. You don't have to talk to them. They didn't talk to them and some of them said they relied on the letter. So when Mr., this is the part Mr. Jones certainly can't be faulted for. He says, I'm having trouble talking to these jurors. They don't want to talk to me in part because of this letter. If you don't want to let me depose them, at least let me subpoena them and bring them in for the evidentiary hearing. And the court says no. Well, I'm not sure there's anything in the record. The courts did not cover themselves in glory, in my opinion, on that issue. I'm not sure there's anything in the record that says specific jurors were contacted and they refused to speak with representatives for Mr. Jones because of the letter sent to them by the district attorney. I mean, I'm not going to argue diligence other than the argument we presented in our brief about the juror misconduct claim with the bailiffs and alcohol. And I wanted to point out to the court that that specific claim was never raised in state habeas until after the evidentiary hearing and the record had been closed. They raised the claim about the Bible and they raised the claim about jurors drinking alcohol, but they never raised the claim about jurors drinking alcohol with a bailiff until after the evidentiary hearing. And we know from their pleadings that the state court didn't give any reason why it was granting the protective order, right? Or why it wasn't allowing subpoenas. I believe that. It just said, no, I'm not letting you do it. Well, they didn't completely shut the door either. They said, I'm not letting you do it. Similar for the reasons the district court said they couldn't get discovery and evidentiary hearing in federal court. You didn't give the state court enough specific factual allegations to bring these jurors in as an exception to the no impeachment rule to allow them to further testify. But you don't usually need a judge's permission to subpoena witnesses. And you don't know whether or not the questioning is going to be about the deliberative process. If the questions, and I understand your point about the claims not being specifically raised at the state habeas point, but if the question, for example, is about pre-deliberation misconduct, the impeachment rule wouldn't bar testimony. I agree. But they never made that type of a claim, right? All they said was, we want full authority to bring these jurors in, all of them, because we believe there may have been an external influence brought to bear. They have to give the district court, whether we're talking about the district court or the state habeas court, the law in Georgia is analogous to Federal Rule of Evidence 606b, where we're not talking about just any witnesses. We're talking about hauling in every single pettit juror to testify in person. Now, if they had given the state habeas court or what we're here talking about today, the district court, more specific factual allegations to get over that line in regards to juror misconduct, then so be it. But as we've argued and as I contend as I stand here today, they simply haven't met the good cause prong for discovery or an evidentiary hearing in regards to either of their misconduct claims. They're simply conclusory allegations without more. And I know that the primary case cited was the McNair case, I believe, on the Bible issue. That was a whole lot more. Factual allegations were made in that case. That was a Christian minister who was a foreperson in that case. He led the jury in prayer. Scripture was read to the jurors. That was put in factual allegations before the court to get them a hearing in district court. Obviously, that's a lot more than simply saying a female juror had a Bible. So can I ask you a question? Yes, John. I should remember McNair better than I do. But so in McNair, you said those were the allegations that led to the grant of a hearing or were those facts that were developed at the hearing? My understanding, those were allegations that were made and then they had a hearing and then the state was able to successfully rebut the presumption of prejudice because the court determined after a hearing that even though those things had occurred in the jury room, there was no effort to sway anyone's decision in regards to the verdict. There were innocuous Bible passages that were read in the courts? Correct. It wasn't. The Bible was held up and specific passages about the death penalty were read in an attempt to pull at their religious heartstrings to say you need to impose the death penalty because of this Bible verse or this Bible verse. That didn't happen in McNair and that was the basis of why their claim ultimately failed. Can I ask you a question about the drinking issue one more time? Opposing counsel suggested that the allegation that jurors were seen drinking with the bailiff would have been a violation of their respective oaths. Is that allegation a violation of their oaths? Is that, I'd have to go back and look at the specific language of their oath. I'm assuming that the oath is the typical one that's given. I mean, and that is right. You're not to discuss the case with the jurors. You're not to have contact with them. In the context, this was a sequestered capital jury in a hotel. The bailiffs are there making sure, you know, that everything is in order. So, I'm not sure if you're asking if the oath itself is, if a violation of that is a basis for misconduct. I mean, they can certainly make that argument and they have here. I'm not sure that was a specific, I can say that I don't believe that was a specific factual allegation that they pled either in state habeas or in the district court in support of that misconduct claim. I mean, it's irregular, right? I mean, that's generally not supposed to happen. Taking on its face, the allegation they made, which was jurors drank with a bailiff, of course, that would be irregular. And if, and I'll leave it at that. But that doesn't change our position that they have, and they needed to, have pled more to get discovery or an evidentiary hearing, especially in the context of their lack of diligence in presenting that claim in support of their arguments to the state habeas court to try to get the same. So, it was almost like they threw it in after the evidentiary hearing in state habeas and then tried to re-raise it 15 years later in a district court brief. And so, I have a real problem in that being enough to be diligent on that specific claim. If there are no further questions on either the juror misconduct claims or the ineffective assistance of counsel claims, I would ask the court to affirm the district court. All right. Thank you very much. Thank you, Your Honor. I have a lot to say, and I'd love to have some of his time. If I speak too fast, please ask me to slow down. I just have a couple of points with respect to the juror misconduct issue, not the juror misconduct, the prosecutorial misconduct issue, and then I want to move on to the discovery in a hearing. First, at the closing argument, the prosecutor argued both that a wrench and a sledgehammer was used by Mr. Jones, and that's because really nobody knows who did what in this case. It was so dark that even Ms. Kimball, the next-door neighbor, couldn't tell that her next-door neighbor was being beaten. It was so dark that his father-in-law didn't recognize him. And with respect to whether these claims were raised, we raised a broad failure to object to misconduct and identified misconduct that included the failure to, like, speak actual facts. And the district court found that the state had waived any argument that we didn't adequately exhaust that claim. Any messy record issues are the fault of the state, which drafted the order that was requested ex parte by the state habeas judge and signed the next day after receiving it. Can I ask you a quick question? Sure. Sort of a factual question about the McNair issue. It sounds like the two of you disagree about what happened to McNair. I can go back and look for myself, but the specifics that we pointed to, or that were at issue in McNair, four-person, Bible in hand, open, reading, praying, those were allegations that led to an evidentiary hearing, or those were facts developed at an evidentiary hearing? So my recollection of McNair is that there was no federal evidentiary hearing period, and they didn't request one. What they had in state court in Alabama was a hearing in state habeas proceedings, and I don't have the, you know, what was filed in state court, so I don't know how it's presented. Okay. But in the normal course of events, as this court is aware, our office goes and interviews jurors, and we get information. Sometimes we get affidavits. That was shut down in this case, and it's really quite ironic that the state is arguing now that we didn't argue enough and didn't present enough when it's the state that shut down our investigative efforts in state habeas proceedings. And when they filed their motion for protective order and we asked for depositions, we filed a response to that, and in that response, we both alleged that there were extraneous influences that we had discovered in the jury, and we asked for a hearing to address those. The court denied our request for a hearing and granted the protective order without saying anything about why it was doing so. I'd like to point out that in Remmer v. United States, the allegations that were raised were based on hearsay reports in the media, which, as we all know, is not always accurate, and the Supreme Court said, we do not know from this record, nor does the petitioner know, what actually transpired or whether the incidents that may have occurred were harmful or harmless, and it required a hearing to determine that, and ultimately, even though the lower courts concluded that the issue was harmless, the Supreme Court found that the interactions were not. Judge Branch, the bailiff's oath took the note that said, you shall make no communication with the jury yourself nor permit anyone to communicate them except by leave of court. There's nothing in the record to suggest that the bailiff's got permission to drink with jurors. And while it's intrusive to compel jurors to testify, we only requested that in light of the fact that we weren't able to talk to jurors and get affidavits to say what happened in the jury room, and it's not unheard of for jurors to be called into court. In Ward v. Hall, three of the jurors submitted affidavits, and one testified live at a state habeas hearing. In McNair, the state record included the state habeas testimony of jurors, and in Remmer, following the Supreme Court's remand, the district court heard testimony from all 12 defendants, among several other witnesses. Just to recap, and following up on Judge Newsom's question, so McNair did not involve a discovery issue under Rule 6a? Correct. Because the evidentiary hearing was held in the state habeas court, the state post-conviction court? Correct, Your Honor. The focus in McNair was whether the defendant, petitioner, had adequately raised his federal claims because he mostly argued state law in state court. And then whether or not on the merits, if you reached a claim, the state had rebutted the presumption of prejudice from bringing a Bible into the jury room? Correct, Your Honor. Right. But there was no Rule 6a discovery issue? Correct, Your Honor. In that case. In this case, there are no impediments to factual development in state court, in federal court, as I've said. And it's important to recognize that this case is not going to open a floodgate to other claims. There are very few cases that will lack the procedural hurdles that EPPLA imposes, and this is not a fishing expedition. Although we don't have a lot of information, we have some information, and that information indicates that things could have gone really wrong in the jury. This is precisely the type of case, moreover, where it could have made a difference, given how close the jury was at sentencing. In conclusion, because I'm about to be out of time, I'd like to repeat some words from the Supreme Court, which is that due process requires a fair trial in a fair tribunal, and that from beginning to end, judicial proceedings conducted for the purpose of deciding whether a defendant shall be put to death must be conducted with dignity and respect. Here, there are significant questions about whether Mr. Jones' trial complied with these basic directives, or whether instead jurors engaged in conduct that undermined the fairness and reliability of Mr. Jones' death sentence. We respectfully submit we should be sent back to the district court. Thank you, Your Honors. All right. Ms. Whitter, thank you very much. Mr. Malcolm, thank you very much. We appreciate the help. We're in recess.